# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **FENG WANG**, *et al.,* ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 18-cv-1732 (TSC) |
| ) | |
| ) | |
| **MICHAEL R. POMPEO,** *et al.,* ) | |
| ) | |
| ) | |
| ) | |
| Defendants. ) | |
| ) | |

## <u>MEMORANDUM OPINION</u>

In 1990, Congress created the EB-5 Immigrant Investor program, which grants the U.S.

Department of State ("State") the authority to issue visas to foreign investors who contribute a

specific amount of capital to U.S. companies and create at least ten U.S. jobs per investment.

The statute creating EB-5 visas provides a path towards permanent residency, but it also sets

various limits on the number of visas that may be issued each fiscal year. It also accords

accompanying spouses and children of EB-5 principals (or those following to join the principals)

the same status and order of consideration as the principal investors. Since 1990, State has

counted these derivative spouses and children of principal immigrant investors toward the yearly

caps on EB-5 visas. Since that time, there have been no legislative, regulatory or judicial

objections to State's counting policy.

Plaintiffs, who contend that this counting policy is unlawful, are thirteen Chinese EB-5 investors provisionally representing a class consisting of: [1] children of investors who have lost or will lose their status as derivative children (i.e., age out) and the class members they provisionally represent; and American Lending Center LLC ("ALC"), which is a U.S.-based regional center sponsor of projects funded with EB-5 investment capital. The Defendants are Michael R. Pompeo, in his official capacity as Secretary of State, Edward J. Ramotowski, in his official capacity as Deputy Assistant Secretary of State for Visa Services, the U.S. Department of State ("State"), and the United States of America.

Plaintiffs have moved for a Preliminary Injunction, ECF No. 2 ("Pls. Mot."), prohibiting Defendants from counting derivatives against the EB-5 caps and requiring Defendants to make available the full number of EB-5 visas that would be available if derivatives were not counted.

Having reviewed the parties' filings (including the brief of *amicus curiae*, Invest in the USA, and Defendants' Opposition), the record, and the relevant case law, the court, for reasons set forth below, hereby **DENIES** Plaintiffs' Motion for Preliminary Injunction.

## I.     BACKGROUND

### A. EB-5 Visa Program

The EB-5 program was created by the Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978 ("The 1990 Act"). The 1990 Act amends the Immigration and Nationality Act, Pub. L. No. 82-414, 66 Stat. 163, 167 (1952) ("INA"), by providing visas under a fifth employment-based preference category, known as EB-5, 8 U.S.C. § 1153(b)(5). Through this

---

[1] This court, on consent of both parties, granted provisional class certification to Plaintiffs for the sole purpose of resolving Plaintiffs' Motion for Preliminary Injunction. *See* ECF No. 29.

program, immigrant investors can obtain lawful permanent residency in the United States for themselves and their spouses and children who are "accompanying or following to join" them, i.e., their derivatives.  INA § 203(d).  The program is "intended to attract foreign capital, encourage economic development," and "benefit the U.S. economy and labor market."  Compl. ¶ 33.

The 1990 Act imposes certain caps on immigrant visas.  First, the worldwide level of employment-based immigrants is capped each fiscal year.  INA § 201(d), 8 U.S.C. § 1151(d).  No more than 7.1 percent of employment-based visa numbers can be awarded to qualified immigrants under EB-5.  INA § 203(b)(5)(A), 8 U.S.C. 1153(b)(5)(A).  This translates to roughly 10,000 EB-5 visas issued annually.  Within the 7.1 percent of the worldwide level, "[n]ot less than 3,000" visas numbers are reserved for qualifying investors in high-unemployment or targeted rural areas.  INA § 203(b)(5)(B), 8 U.S.C. § 1153(b)(5)(B).  Second, the statute sets a per country limit by restricting visas accorded to immigrants from any single country to 7 percent of the annual overall EB-5 category.  INA § 202(a)(2), 8 U.S.C. § 1152(a)(2).  The Chinese Student Protection Act of 1992, Pub. L. No. 102-404, 106 Stat. 1969, further restricts the number of EB-5 visas available to Chinese immigrants by deducting 700 visa numbers from the EB-5 limit.

A foreign investor seeking an EB-5 visa must first file a Petition on Form I-526 with the United States Citizenship and Immigration Services ("USCIS") seeking classification as an EB-5 investor.  8 U.S.C. § 1154(a)(1)(H); 8 C.F.R. § 204.6(a).  The investor must prove that he or she is 1) investing, or is in the process of investing, either $1,000,000 into a new commercial enterprise or $500,000 into a new commercial enterprise if the investment is made in a rural area

or area of high unemployment, and 2) creating, or is in the process of creating, at least ten new jobs from the investment. 8 U.S.C. § 1153(b)(5); 8 C.F.R. § 204.6(j). The petition must also demonstrate that the investor obtained the capital legally. *Id.* If USCIS approves the petition it is sent to State for immigrant visa pre-processing. Once the petition is approved, it is given a priority date, determined by the date on which it was filed with USCIS. 8 C.F.R. § 204.6(d).

At the beginning of each month, State receives information from consular posts worldwide and USCIS and calculates how many visa number are available. Decl. of Charles Oppenheim ¶ 3, ECF No. 13-2, Defs. Ex. 1 ("Oppenheim Decl."). Once a visa number becomes available, an EB-5 investor physically located in the United States may file an application for an adjustment of status to a lawful permanent resident with USCIS. *Id.* ¶ 2; 8 U.S.C. § 1255. An investor who is not in the United States when the petition is approved may file for an immigrant visa at a U.S. embassy or consulate. 8 U.S.C. §§ 1201-1202. Aliens physically present in the United States and those outside the United States are allocated numbers from the same group of available visas. 22 C.F.R. § 42.51(b). If, however, the number of qualified applicants in a visa category is greater than the amount of visa numbers available for allotment for the month, State considers the category to be "oversubscribed," and establishes and publishes a cut-off date, referred to as a "final action date." Oppenheim Decl. ¶ 5. Only EB-5 investors with approved I-526 petitions filed before the cut-off date can obtain available visa numbers in order of priority date. Defendants describe the process as follows:

> When visa numbers are 'oversubscribed,' not all beneficiaries of approved petition who may seek adjustment of status or an immigrant visa can immediately be processed to conclusion. Only persons with priority dates earlier than a cut-off date are allotted a visa number and are thus eligible for final adjustment of status by USCIS or for issuance of an immigrant visa by State. Persons with a priority date on or after the cut-off date must wait until future movement of the cut-off date allows numbers to be allocated.

Defs. Resp. in Opp. to Pls. Mot. for Prelim. Inj. ("Defs. Opp.") at 8, ECF No. 13-1, (citations omitted).

INA § 203(d) provides that derivative spouses and children of employment-based immigrants who are "accompanying or following to join" the principal immigrant are "entitled to the same status, and the same order of consideration" as the principal. 8 U.S.C. § 1153(d). The section states in full:

> A spouse or child as defined in subparagraph (A), (B), (C), (D), or (E) of section 1101(b)(1) of this title shall, if not otherwise entitled to an immigrant status and the immediate issuance of a visa under subsection (a), (b), or (c), be entitled to the same status, and the same order of consideration provided in the respective subsection, if accompanying or following to join, the spouse or parent.

*Id.* Section 203(d) gives derivative spouses and children the option of either "accompanying" or "following to join" their principal. A derivative is accompanying his or her principal investor when the derivative seeks permanent residency within six months of the principal's admission. 22 C.F.R. § 40.1(a)(1) ("Accompanying or accompanied by means not only an alien in the physical company of a principal alien but also an alien who is issued an immigrant visa within 6 months of: (i) The date of issuance of a visa to the principal alien; (ii) The date of adjustment of status in the United States of the principal alien; or (iii) The date on which the principal alien personally appears and registers before a consular officer abroad to confer alternate foreign state chargeability or immigrant status upon a spouse or child."). A derivative can "follow[]-to-join" the principal at any time after the investor obtains permanent residency. 9 Foreign Affairs Manual 503.2-4(A)(c)(1) ("A spouse or child acquired prior to the admission of the principal alien may be considered to be 'following-to-join,' regardless of the time which may have elapsed since the principal alien's admission to the United States.").

Under the statute, a child must be unmarried and under twenty-one years old. 8 U.S.C. § 1101(b)(1). If an EB-5 principal investor's child turns twenty-one before a visa number becomes available to the principal, the child "ages out" and can no longer be considered a derivative. However, under the Child Status Protection Act, Pub. L. No. 107-208, 116 Stat. 927 (2002) ("CSPA"), a child's age "freezes" while the investor's I-526 petition is pending. If by the time the I-526 petition is approved a visa number is not available, the child's age "unfreezes" and resumes accruing until a visa becomes available to the investor. 8 U.S.C. § 1153(h)(1)(A)-(B). In order to qualify for CSPA protection, the child must seek permanent residence within one year of the time a visa number becomes available to his or her parent. *Id.*

Immigrant investors, instead of investing directly in U.S. businesses, can invest through regional centers, and INA § 203(b)(5)(B) requires that 3,000 of the annual EB-5 visas be set aside for immigrants investing in commercial enterprises associated with regional centers.

State has always interpreted INA § 203(d) to mean that "[f]or all numerically limited visa categories, which includes all employment-based" categories, "visas issued to derivatives are counted toward the annual immigrant visa caps." Defs. Opp. at 5. The parties agree that the demand for EB-5 visas from Chinese applicants currently exceeds the supply. *Id.* at 12 (citing Oppenheim Decl. ¶¶ 11–12); Pls. Mot. at 8, and Defendants concede that "applicants from China have a longer wait." Defs. Opp. at 22 (quoting Oppenheim Decl. ¶ 12). In Plaintiffs' view, this "backlog" has been caused by the government's counting policy. Pls. Mot. at 17. Citing a government report, Plaintiffs allege that "Chinese investors who filed an I-526 petition in 2017 will need to wait over a decade before the Department of State allows them to immigrate to the U.S. based on their investments." Pls. Mot. at 9. Moreover, "Chinese investors who file I-526

Petitions in Fiscal Year 2018 will likely be forced to wait approximately 16 years before they qualify to obtain permanent residency based on their investments." *Id.*

### B. Plaintiffs' Request for Injunctive Relief

Plaintiffs' motion for injunctive relief argues that State must allocate available EB-5 visas numbers only to investors themselves and may not count derivative EB-5 beneficiaries against the annual caps. Plaintiffs further contend that State's counting policy violates the INA and that State's cut-off dates constitute final agency action that is arbitrary and capricious under the Administrative Procedure Act ("APA"). Pls. Mot. at 11. Plaintiffs ask the court to issue an injunction "barring Defendants from counting visas issued to spouses and children of investors against the annual EB-5 visa allotment" and "to order the Department to make immediately available all visa numbers which should have been assigned to EB-5 investors but were not because of the Department's unlawful Counting Policy." *Id.* at 2. Plaintiffs assert that this injunctive relief is necessary to prevent irreparable harm, particularly with respect to Plaintiffs Feng Wang, Hongmei Xiao, and Jianhong Yang, "whose children will 'age out' of eligibility" imminently "absent relief from this [c]ourt." *Id.*

## II. LEGAL STANDARD

A preliminary injunction is an "extraordinary and drastic remedy" that is "never awarded as of right." *Munaf v. Geren,* 553 U.S. 674, 689–90 (2008) (internal citations and quotation marks omitted). A preliminary injunction "should not be granted unless the movant, *by a clear showing,* carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (internal citations and quotation marks omitted) (emphasis in original).

To prevail on a motion for a preliminary injunction, the movant must show that: "he is likely to succeed on the merits, . . . he is likely to suffer irreparable harm in the absence of preliminary relief, . . . the balance of equities tips in his favor, and . . . an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008). Typically, these factors have "been evaluated on a 'sliding scale.'" *Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288, 1291 (D.C. Cir. 2009) (quoting *Davenport v. Int'l Bhd. of Teamsters,* 166 F.3d 356, 361 (D.C. Cir. 1999)). "If the movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor." *Id.* at 1291-92. "However, the continued viability of the sliding scale approach is uncertain 'as the Supreme Court and the D.C. Circuit have strongly suggested, without holding, that a likelihood of success on the merits is an independent, free-standing requirement for a preliminary injunction.'" *In re Navy Chaplaincy*, 928 F. Supp. 2d 26, 32 (D.D.C. 2013) (quoting *Stand Up for California! v. U.S. Dep't of the Interior*, 919 F. Supp. 2d 51, 61 (D.D.C. 2013)); *see also Sherley v. Sebelius*, 644 F.3d 388, 393 (D.C. Cir. 2011) ("[W]e read *Winter* at least to suggest if not to hold 'that a likelihood of success is an independent, free-standing requirement for a preliminary injunction.'") (quoting *Davis*, 571 F.3d at 1296) (concurring opinion)); *Aracely R. v. Nielsen*, 319 F. Supp. 3d 110, 125 (D.D.C. 2018) ("Of these factors, likelihood of success on the merits and irreparable harm are particularly crucial.") (citation omitted).[2]

---

[2] This court need not resolve this ambiguity, because Plaintiffs fail under the sliding-scale framework and, therefore, "*a fortiori* they cannot satisfy the more stringent standard alluded to by the Supreme Court and the Court of Appeals." *Stand Up for California!*, 919 F. Supp. 2d at 62.

Moreover, "the standard for obtaining an injunction is significantly heightened when a plaintiff requests affirmative injunctive relief." *Tex. Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 247 (D.D.C. 2014) (citing *Bradshaw v. Veneman,* 338 F. Supp. 2d 139, 144 (D.D.C. 2004)). In such cases, the court must "exercise extreme caution." *Aracely R.*, 319 F. Supp. 3d at 126 (D.D.C. 2018). "The power to issue a preliminary injunction, especially a mandatory one, should be sparingly exercised." *Dorfmann v. Boozer,* 414 F.2d 1168, 1173 (D.C. Cir. 1969) (internal citations and quotation marks omitted).

## III.  ANALYSIS

### A.  Likelihood Of Success On The Merits

> 1. <u>Plaintiffs Are Not Likely To Succeed On The Merits Of Their Argument That State Has Incorrectly Interpreted The INA</u>

The D.C. Circuit "read[s] *Winter* at least to suggest if not to hold 'that a likelihood of success is an independent, free-standing requirement for a preliminary injunction." *Sherley*, 644 F.3d at 393 (quoting *Davis*, 571 F.3d at 1296 (concurring opinion)). Therefore, it is "particularly important for the movant to demonstrate a likelihood of success on the merits." *Konarski v. Donovan*, 763 F. Supp. 2d 128, 132 (D.D.C. 2011). "In ruling on a preliminary injunction a key issue—often the dispositive one—is whether the movant has shown a substantial likelihood of success on the merits." *Greater New Orleans Fair Hous. Action Ctr. v. U.S. Dep't of Hous. & Urban Dev.*, 639 F.3d 1078, 1083 (D.C. Cir. 2011).

> *a.  The INA Language Supports State's Counting Policy*

In 1965 Congress passed the Immigration and Nationality Act Amendments of 1965, Pub. L. No. 89-236, 79 Stat. 911, 912 ("the 1965 Act"). The 1965 Act amended Section 203 of

the INA by establishing seven preference categories of available immigrant visas. These seven

categories added up to 100 percent of the total number of immigrant visas available each year.

The eighth category was a catch-all category. The ninth category applied to spouses and

children:

> Section 203(a): Aliens who are subject to the numerical limitations specified in section
> 201(a) shall be allotted visas . . . as follows: . . .
>
> (9) A spouse or child . . . shall, if not otherwise entitled to an immigrant status and the
> immediate issuance of a visa or to conditional entry under paragraphs (1) through (8), be
> entitled to the same status, and the same order of consideration provided in subsection
> (b), if accompanying, or following to join, his spouse or parent.

Section 203(b) stated: "In considering applications for immigrant visas under subsection (a),

consideration shall be given to applicants in the order in which the classes of which they are

members are listed in subsection (a)."

The parties agree that the 1965 Act counted principals' spouses and children against the

worldwide cap. Compl. ¶¶ 43-44; Defs. Opp. at 21. The use of the phrase "entitled to the same

status, and the same order of consideration" in § 203(a)(9) accorded derivative spouses and

children of immigrants the ability to immigrate at the same time and in the same category as their

principals and use the same visa number available to the principal investor. For the next twenty-

five years, in accordance with the 1965 Act, State counted derivative spouses and children

towards the cap.

In 1990, Congress passed the Immigration Act of 1990, which changed the organization

of the INA by grouping the preference categories in three subsections: 1) family-based

preferences, subsection 203(a); 2) employment-based preferences, subsection 203(b); and 3) a

new category of "diversity" immigrants, subsection 203(c). *Id.* The 1990 Act added separate

caps for family-based, employment-based, and diversity immigrants, but the three subsections continued to be subject to the cap in INA § 201. *Id.*

In addition, the 1990 Act addressed the issue of principal immigrants' spouses and children:

> Treatment of family members. A spouse or child . . . shall, if not otherwise entitled to an immigrant status and the immediate issuance of a visa under subsection (a), (b), or (c), be entitled to the same status, and the same order of consideration provided in the respective subsection, if accompanying or following to join, the spouse or parent.

INA § 203. This section allows a derivative to obtain a visa through his or her principal and to be entitled to the same status and order of consideration accorded to the principal. Section 203(d) of the INA, as amended by the 1990 Act, is virtually identical to § 203(a)(9) as it existed after the 1965 Act.

Congress did not adopt this virtually identical language in a vacuum. When it replicated this language in the 1990 Act, Congress was aware that for twenty-five years State had interpreted § 203(a)(9) as amended by the 1965 Act to count derivatives against the caps. "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." *Lorillard v. Pons*, 434 U.S. 575, 580 (1978).

Plaintiffs nonetheless argue that this canon of construction does not apply because the language in former § 203(a)(9) was not re-enacted "without change." Rather, "the provision according status to spouses and children [was moved] *outside* of any provision specifying the immigrants subject to the worldwide limits." Pls. Rep. in Supp. of Mot. for Prelim. Inj. ("Pls.

Rep."), ECF No. 20 at 10 (emphasis in original). This, Plaintiffs argue, "significantly," changed the statute. *Id.*

While Plaintiffs are correct that the 1990 Act did modify the INA's structure, Plaintiffs have failed to proffer any "evidence of any intent to repudiate the longstanding administrative construction." *Haig v. Agee*, 453 U.S. 280, 297 (1981). In the absence of such evidence, the court concludes that when Congress amended the INA in 1990, using the same language as it used in 1965, it was adopting the "longstanding administrative construction," *id.* at 298, of the provision for derivatives.

If Congress had intended to repudiate State's interpretation of the statute—with substantial immigration consequences—it would have done so clearly. By retaining the language pertaining to derivatives from the 1965 Act, Congress signaled that it was not making a monumental shift in immigration law with regard to derivatives. As the Supreme Court stated in *Lorillard,* "where, as here, Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute." 434 U.S. at 581.

### b. *Legislative History Supports Defendants' Argument*

The legislative history of the 1990 Act further supports the conclusion that Congress intended to continue State's twenty-five-year interpretation of the 1965 Act by counting derivatives towards the caps. Each chamber passed its own bill. The Senate's version of INA § 203 included a subsection 203(c), which repeated the language on derivatives in the 1965 Act and applied it to each of the preference categories. Immigration Act of 1989, S. 358, 101st Cong. § 203(c) (as passed by Senate, July 13, 1989), 135 Cong. Rec. S8639-04, 1989 WL

181548. The House bill, however, took a different approach. Importantly, it explicitly exempted derivatives from the cap for employment-based immigrants. Section 101 of the House bill provided:

> (b) ALIENS NOT SUBJECT TO NUMERICAL LIMITATIONS.- The following aliens are not subject to the worldwide levels or numerical limitations of subsection (a): . . .
>
> (3) An alien who is provided immigrant status under section 203(d) as the spouse or child of an immigrant under section 203(b).

Defs. Opp. at 28. Thus, the Senate version continued to count derivatives towards the cap while the House version explicitly excluded derivatives from the cap.

These conflicting approaches are also reflected in the different numerical cap proposals in the House and Senate bills. The Senate proposed 150,000 annual visas. Immigration Act of 1989, S. 358, 101st Cong. § 201(d) (as passed by Senate, July 13, 1989), 135 Cong. Rec. S8639-04, 1989 WL 181548. The House proposed 65,000 principals. If, as Defendants suggest, each principal brings one or two derivatives, Defs. Opp. at 29-30, it appears that the two chambers were considering similar yearly total numbers of employment-based immigrants; the difference was in whether or not to count derivatives.

The Conference Committee incorporated the Senate's approach and rejected the House's language that specifically exempted employment-based principals' spouses and children from the cap. The Conference Committee also set the employment-based cap at 140,000—just 10,000 fewer than the 150,000 initially proposed by the Senate. The Conference Report explained that the House's proposed cap was based solely on principals and did not include derivative spouses and children. H. Rep. 101-955, 136 Cong. Rec. H13203-01, H13236, 1990 WL 290409 (Oct. 26,

1990) ("The comparable House number for employment-based immigrants was 187,500, based on 75,000 principals. The House amendment allocated 65,000 employment-based visas during FY1991-96 and 75,000 thereafter (not including numerically exempt derivative spouses and children) . . ."). These references to the House's methodology, based on principals but not derivatives, show that the Committee intended to adopt a methodology for counting based on principals and derivatives. Thus, the court concludes that Congress was aware of, grappled with and ultimately rejected the House's proposal to not count derivatives towards the yearly cap. Although Plaintiffs point the court to various statements made by members of Congress suggesting that derivatives were excluded from the yearly cap, these isolated floor statements carry little weight relative to the decisive language in the Conference Committee Report.

        *c.  Because EB-5 Derivatives Are Counted Towards The Country Caps, They Must Also Be Counted Towards The Worldwide Cap*

As noted above, the INA imposes a country cap as well as a worldwide cap. INA § 202(b) determines which country derivative spouses and children should be assigned to, for purposes of the § 202(a)(2) country cap, if they are "accompanying or following to join," their investors. *Id.* Section 202(b) states:

(b) Rules for chargeability

Each independent country . . . shall be treated as a separate foreign state for the purposes of a numerical level established under subsection (a)(2) . . . . For the purposes of this chapter the foreign state to which an immigrant is chargeable shall be determined by birth within such foreign state except that (1) an alien child, when accompanied by or following to join his alien parent or parents, may be charged to the foreign state of either parent if such parent has received or would be qualified for an immigrant visa, if necessary to prevent the separation of the child from the parent or parents, and if immigration charged to the foreign state to which such parent has been or would be chargeable has

not reached a numerical level established under subsection (a)(2) for that fiscal year; (2) if an alien is chargeable to a different foreign state from that of his spouse, the foreign state to which such alien is chargeable may, if necessary to prevent the separation of husband and wife, be determined by the foreign state of the spouse he is accompanying or following to join, if such spouse has received or would be qualified for an immigrant visa and if immigration charged to the foreign state to which such spouse has been or would be chargeable has not reached a numerical level established under subsection (a)(2) for that fiscal year . . . .

This rule necessarily presumes that derivatives are counted toward the per county cap; otherwise, the question of chargeability would be irrelevant. Because the country cap is a subset of the worldwide caps, the worldwide caps also apply to derivatives.

While Plaintiffs agree that EB-5 derivative spouses and children are counted toward the country cap, they dispute that they are also counted toward the worldwide levels. "[T]here is no statutory reason to suppose that just because spouses and children count against the per country limits of Section 202, they also count against the worldwide limits specified by Section 203." Pls. Rep. at 16. However, the court is not persuaded by Plaintiffs' argument that derivatives should be counted in the country caps, which are a subset of the worldwide cap, but not in the worldwide caps themselves.

Perhaps recognizing the weakness of this argument, Amicus Curiae Invest in the USA argues that not all derivatives are counted even towards the per country caps because the country caps apply only to derivatives who receive status under INA §§ 203(a) and 203(b), and not those who receive status under INA § 203(d). Amici Curiae in Supp. of Pls. ("Amicus Brief") at 4-5, ECF No. 27. This argument fails because § 203(d) does not provide an independent status for derivatives; it accords derivatives the "same status" as their principals.

In an attempt to show that the country cap applies to some derivatives other than those identified in § 203(d), Amicus points to minor children and spouses of Legal Permanent

Residents ("LPRs") in INA § 203(a)(2)(A).  But the family members described in § 203(a)(2)(A) are not derivatives, and the provision does not contain the language "accompanying or following to join," which is the language § 202(b) and § 203(d) use to describe derivatives.  Section 203(a)(2)(A) describes children as family-sponsored principal beneficiaries, not as derivatives.

Amicus also points to spouses and children of special immigrants described in INA § 101(a)(27).  A special immigrant is an employment-based category under § 203(b)(4).  Because § 101(a)(27) includes the derivative-type language of "accompanying or following to join" the principal, Amicus argues that this derivative language would be redundant if § 203(d) derivatives counted toward the caps.  However, this argument fails because the derivative-type language in the special immigrant provision has an independent purpose:  It gives certain relatives a greater eligibility to immigrate than they would have if their eligibility depended solely on § 203(d).

       2.   <u>Plaintiffs Are Not Likely To Succeed On The Merits Of Their Argument That State Did Not Comply With The APA's Notice And Comment Requirements</u>

Plaintiffs argue that "Defendants' Counting Policy is also invalid because it does not comply with the APA's procedural notice-and-comment requirements."  Pls. Mot. at 22. "Section 553 of the Administrative Procedure Act requires agencies to afford notice of a proposed rulemaking and an opportunity for public comment prior to a rule's promulgation, amendment, modification, or repeal."  *Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1044 (D.C. Cir. 1987).  "An agency seeking to [promulgate, amend, modify or repeal a rule] must publish '[g]eneral notice of proposed rule making ... in the Federal Register' and 'give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation.'"  *United Steel, Paper &*

*Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union v. Fed. Highway Admin.*, 151 F. Supp. 3d 76, 85 (D.D.C. 2015) (quoting 5 U.S.C. §§ 553(b)-(c)).

Defendants point out, however, that after passage of the 1965 Act, State amended its regulations in Part 22 of the Code of Federal Regulations. Defs. Opp. at 36 (citing 30 Fed. Reg. 14,783 (Nov. 23, 1965)). Defendants also note that after passage of the 1990 Act, State again "revised its regulations to incorporate the new provision of law." *Id.* at 36-37 (citing Interim Rule, *Visas: Documentation of Immigrants Under the Immigration and Nationality Act, as Amended; Immigrants Not Subject to Numerical Limitations of INA 201 and 202; Immigrants Subject to Numerical Limitation*, 56 Fed. Reg. 49,675 (Oct. 1, 1991)). This interim rule, 56 Fed. Reg. 49,675, issued on October 1, 1991, provided a 30-day public comment period. ("Written comments must be received on or before October 31, 1991.") State finalized its rule in 1993 and noted that "Interim Rule 1491, published in the Federal Register at 56 FR 49675, October 1, 1991, invited interested person to submit comments concerning the amendments therein. No comments were received." Final Rule, *Visas: Documentation of Immigrants Under the Immigration and Nationality Act, as Amended; Numerical Limitations*, 58 Fed. Reg. 48,446 (Sept. 16 1993). The "Interim Rule's regulations" from 1991 were "adopted without changes," *id.*, in September 1993. In light of this background, the court finds that State complied with notice and comment requirements.

***

Because the D.C. Circuit has not clearly held that a failure to demonstrate a likelihood of success on the merits is necessarily fatal to a request for a preliminary injunction, the court analyzes the remaining preliminary injunction factors.

### B. Irreparable Harm

While "[t]he concept of irreparable harm does not readily lend itself to definition," *Judicial Watch, Inc. v. DHS*, 514 F. Supp. 2d 7, 10 (D.D.C. 2007), the D.C. Circuit has declared that Plaintiffs carry a "considerable burden," *Power Mobility Coal. v. Leavitt*, 404 F. Supp. 2d 190, 204 (D.D.C. 2005), of proving irreparable harm. The party seeking injunctive relief must prove that the purported injuries are "both certain and great," and they "must be actual and not theoretical." *Wisconsin Gas Co. v. F.E.R.C.*, 758 F.2d 669, 674 (D.C. Cir. 1985). The movant must also "substantiate the claim" of irreparable harm and "show that the alleged harm will directly result from the action which the movant seeks to enjoin." *Id.* The mere possibility of irreparable harm is insufficient. *Winter*, 555 U.S. at 22. "[T]he party seeking injunctive relief must show that "[t]he injury complained of [is] of such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable harm." *Wisconsin Gas Co.*, 758 F.2d at 674 (internal quotation marks omitted) (emphasis and alterations in original). Finally, the harm claimed must be "beyond remediation." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).

#### 1. Plaintiffs Have Failed to Show Irreparable Harm

Plaintiffs advance two theories of irreparable harm. First and primarily, they allege that without an injunction their families will be separated because their derivative children will age out and become ineligible for derivative status by the time visas are available and will be unable to join their parents in the United States. Pls. Mot. at 27. Second, Plaintiffs allege irreparable harm to their families' finances, career prospects, and their investments unless the court issues a preliminary injunction.

Plaintiffs have not carried their considerable burden of demonstrating irreparable harm. Most importantly, they provide no support for their argument that the prospect of family separation constitutes an irreparable harm. Plaintiffs argue that once investors' children age out, the investors are faced with the choice of either immigrating to the United States without their children or staying in China and forgoing the benefit of the EB-5 visa. Pls. Mot. at 26 ("The parent investor must then face the prospect of immigrating to the United States without her entire family or give up the prospect of immigrating to the United States altogether.").

Plaintiffs cite one case in support of their family separation argument, *Washington v. Trump*, 847 F.3d 1151, 1169 (9th Cir. 2017), and their reliance on that case is misplaced. In *Washington v. Trump*, some visa holders were detained and not allowed back in the United States. The Ninth Circuit found that "[t]he impact of the Executive Order was immediate and widespread. It was reported that thousands of visas were immediately canceled, hundreds of travelers with such visas were prevented from boarding airplanes bound for the United States or denied entry on arrival, and some travelers were detained." *Washington v. Trump*, 847 F.3d at 1157. Those extreme circumstances are far different from the facts of this case.

Plaintiffs proffer three examples of potential family separation in this case. *See* Pls. Mot. at 26. First, Plaintiff Fang Wang alleges that after visiting the United States in 2012, his daughter wanted to study, live, and work there. ECF No. 2-2, Ex. 2 to Pls. Mot. ("Wang Decl.") at ¶ 3. In 2014 Wang made an investment through the EB-5 program because he "wished to provide [his] daughter with a path to U.S. residency and citizenship as a derivative EB-5 applicant, so that she could realize her dreams of living in the U.S." *Id.* at ¶ 4-5. Wang states that when he filed an I-526 petition, he believed that his family would be living in the United

States before his daughter aged out. *Id.* at ¶ 6. Wang and his child are currently living in China. *Id.* at ¶¶ 1-2. But Wang's Declaration does not demonstrate that he will imminently face family separation. The possibility that Wang's daughter might age out does not show that the family will be imminently and irrevocably separated. The other two examples, plaintiffs Jiahong Yang and Hongmei Xiao, both have children who are currently studying in the United States. ECF No. 2-3, Ex. 3 to Pls. Mot. ("Xiao Decl."); ECF No. 2-4, Ex. 4 to Pls. Mot. ("Yang Decl."). While it does appear that Yang's and Hongmei's children will age out, this harm is not "beyond remediation," *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297, because the families can reunite in China if they choose, a solution that is neither unfeasible nor unsafe.

State's counting policy does not, in and of itself, cause family separation. Rather, the causal connection is between the counting policy and the choice investors face if their children age out by the time EB-5 visas become available. Plaintiffs cite no law for the proposition that choosing between immigrating to the United States without their entire families or not immigrating and staying with their entire families constitutes irreparable harm.

Plaintiffs also argue that children's aging out irreparably harms family finances and career prospects, that the backlog harms investors' career prospects, and that the counting policy harms the investments themselves. Pls. Mot. at 27-28. These claims are insufficient to establish irreparable harm. It is "well settled that economic loss does not, in and of itself, constitute irreparable harm." *Wisconsin Gas Co.*, 758 F.2d at 674. "'The key word in this consideration is *irreparable*. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough.' . . . Recoverable monetary loss may constitute irreparable harm only where the loss threatens the very existence of the movant's

business." *Id.* (quoting *Virginia Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958) (emphasis in original) (citation omitted)).

  2. <u>There Is No Irreparable Harm To American Lending Center</u>

  Plaintiff ALC has also failed to carry its burden of proving irreparable harm.  ALC claims that State's counting policy threatens to put it out of business because it relies on Chinese investors to stay in business.  Pls. Mot. at 29-30 ("Without demand for ALC's services from Chinese nationals, the company will be unable to stay in business.").  Furthermore, ALC argues that the demand among Chinese nationals for EB-5 visas has decreased and attributes this decline in interest to the visa backlog caused by State's counting policy.  *Id.*

  This argument is unconvincing.  While it may be true that ALC has historically relied on Chinese investors, ECF No. 2-5, Ex. 5 to Pls. Mot. ("Aff. of John Shen") at ¶ 6, ALC fails to explain why its business can operate only with Chinese investors.  In fact, statements from Plaintiffs indicate that ALC realized the advantage of seeking EB-5 investors in other countries over a year ago.  *Id.* at ¶ 12 ("In fact, as a result of the drastic fall off of investment from China, we have spent over one million dollars to recruit investors from other countries between July 1, 2017 and June 30, 2018.").  Moreover, as Defendants point out, "ALC announced earlier this year it was opening a new office in Taipei, Taiwan, which ALC says 'will be a key asset in the company's ongoing growth into new markets.'"  Defs. Opp. at 50 (quoting Yahoo! Finance, *American Lending Center Announces Taiwan Expansion* (Apr. 16, 2018), https://finance.yahoo.com/news/american-lending-center-announces-taiwan-050000533.html).  While ALC asserts that its efforts to diversify its customer base may be futile, such speculation is insufficient to establish irreparable harm.

### C. Balancing Of The Equities And Public Interest

In addition to analyzing substantial likelihood on the merits and irreparable harm, "courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (internal quotation marks omitted) (quoting *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 542 (1987)). "[C]ourts ... should [also] pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312 (1982) (citation omitted). When the government is the non-movant, as it is in this case, these factor merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009); *see also Doe v. Mattis*, 889 F.3d 745, 766 (D.C. Cir. 2018) ("When a private party seeks injunctive relief against the government, the final two injunction factors—the balance of equities and the public interest—generally call for weighing the benefits to the private party from obtaining an injunction against the harms to the government and the public from being enjoined.").

Plaintiffs argue first that the public benefits from the increase in jobs that flow from increased foreign investment. Second, Plaintiffs contend that "stifling [] foreign investment in the United States is directly at odds with Congress' clearly stated purpose for the EB-5 program." Pls. Mot. at 33.

By limiting the number of available EB-5 visas in any given year, Congress made clear that whether or not derivatives were to be counted, foreign investment through the EB-5 program could not be unbounded. The public has an interest in maintaining diversity of immigrants, as INA § 202's country cap demonstrates. The public benefits not just from diversity among countries, but also from the types of visas that are allocated. The benefits of investor visas must

be balanced against State's interest in setting limits on immigration. Therefore, Plaintiffs' argument that reducing the number of investors "frustrates the clear statutory purpose of the EB-5 program," *id.*, is unavailing.

Finally, Plaintiffs argue that the government will not suffer any injury if the injunction is issued. This argument is without merit. The government has the responsibility to set immigration policy, including numerical limits. The government and public benefit from a stable and diverse immigration system. Granting an injunction would disrupt and frustrate these substantial benefits.

Therefore, the court finds that the benefits to the Plaintiffs are outweighed by the harms to the public and government caused by an injunction.

## IV.     CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for a Preliminary Injunction is hereby **DENIED**.

A corresponding order will issue separately.


Date:  December 6, 2018


*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge