UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FENG WANG, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civil Action No. 18-cv-1732 (TSC) |
| | ) |
| MICHAEL R. POMPEO, *et al.*, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION

Under the EB-5 Immigrant Investor program, the U.S. Department of State ("State") has authority to issue visas to both foreign investors who meet the statutory criteria, and their derivative spouses and children, who accompany or follow to join them. The Immigration and Nationality Act ("INA") limits the number of visas that can be issued each fiscal year under the EB-5 program, and State counts both investors and their derivatives toward the annual limit. Plaintiffs, thirteen Chinese national EB-5 investors, challenge State's policy of counting derivatives toward the limit, claiming it violates the Administrative Procedure Act ("APA").

Defendants move to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). (ECF No. 41.) Having reviewed the parties' briefing and the relevant case law, the court, for the reasons set forth below, will GRANT Defendants' motion to dismiss.

### I. BACKGROUND

The Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978 (the "1990 Act") created the EB-5 program. The 1990 Act amended the INA by creating a fifth employment-

based visa preference category, known as EB-5. 8 U.S.C. § 1153(b)(5). Through this program, immigrant investors can obtain lawful permanent residency in the United States for themselves and their spouses and children, i.e., their derivatives, who are "accompanying or following to join" them. INA § 203(d), 8 U.S.C. § 1153(d). The program is "intended to attract foreign capital, encourage economic development," and "benefit the U.S. economy and labor market." (ECF No. 14 ("Compl.") ¶ 33.)

Foreign investors seeking EB-5 visas must first file a petition with the United States Citizenship and Immigration Services ("USCIS") seeking classification as an EB-5 investor. 8 U.S.C. § 1154(a)(1)(H); 8 C.F.R. § 204.6(a). Investors must prove that they meet the statutory criteria, including investing sufficient amounts in commercial enterprises, creating at least ten jobs from the investment, and obtaining capital legally. 8 U.S.C. § 1153(b)(5); 8 C.F.R. § 204.6(j). USCIS sends approved petitions to State for immigrant visa pre-processing. Once the petition is approved, it is given a priority date—the date filed with USCIS. 8 C.F.R. § 204.6(d). A petition's priority date determines the order of consideration for available visa numbers. *See* 8 U.S.C. § 1153(b)(5); 22 C.F.R. § 42.53(a).

The INA limits the number of immigrant visas issued each year. First, it caps the worldwide level of employment-based immigrants each fiscal year. INA § 201(d), 8 U.S.C. § 1151(d). No more than 7.1 percent of employment-based visas can be awarded to qualified immigrants under EB-5. INA § 203(b)(5)(A), 8 U.S.C. 1153(b)(5)(A). This translates to roughly 10,000 EB-5 visas issued annually. Within the 7.1 percent of the worldwide level, "[n]ot less than 3,000" visas are reserved for qualifying investors in "targeted employment areas," which are high-unemployment or certain rural areas. INA § 203(b)(5)(B), 8 U.S.C. § 1153(b)(5)(B). State is also required to reserve 3,000 visas for investors in commercial

enterprises associated with regional centers. 8 U.S.C. § 1153 note (2012) (Immigration Program). Second, the INA restricts visas accorded to immigrants from any single country to 7 percent of the annual overall EB-5 category. INA § 202(a)(2), 8 U.S.C. § 1152(a)(2). Based on these limits, State's Visa Office calculates how many visa numbers (the budgetary device used to avoid exceeding these numerical limits) are available for issuance. *See* 8 U.S.C. § 1153(g).

Each month, State publishes the number of visa numbers available in its Visa Bulletin. (Compl. ¶ 38.) When there are more qualified applicants in a visa category than the visa numbers available for the month, State considers the category to be "oversubscribed." *See, e.g.*, Bureau of Consular Affairs, U.S. Dep't of State, Bull. No. 19, Vol. X, Visa Bulletin, Immigrant Numbers for July 2018. When this occurs, not all EB-5 investors with approved petitions can seek adjustment of status or have their visas processed and issued. Consequently, State sets a cut-off date and allocates the available visa numbers to people with priority dates before the cut-off. *See, e.g.*, *id.* Once a visa number becomes available, EB-5 investors can either apply for adjustment of status (if they are already present in the United States) or for a visa at a U.S. embassy or consulate (if they are outside the United States). 8 U.S.C. §§ 1255, 1201, 1202. EB-5 investors inside and outside the United States are allocated visa numbers from the same pool of available visa numbers. 22 C.F.R. § 42.51(b).

Under INA § 203(d), employment-based immigrants' spouses and children are "entitled to the same status, and the same order of consideration" as the principal immigrant if they are "accompanying or following to join" the principal. 8 U.S.C. § 1153(d). A derivative spouse or child is deemed to be "accompanying" the principal investor when the derivative seeks permanent residency within six months of the principal's admission. 22 C.F.R. § 40.1(a)(1). A derivative can "follow[]-to-join" the principal at any time after the investor obtains permanent

3

residency. 9 Foreign Affairs Manual 503.2-4(A)(c)(1). State interprets subsection 203(d) to mean that "[f]or all numerically limited visa categories, which includes all employment-based" categories, "visas issued to derivatives are counted toward the annual immigrant visa caps." (ECF No. 41-1 ("Defs. Br.") at 5.)

The parties agree that the demand for EB-5 visas from Chinese applicants currently exceeds the supply (Compl ¶¶ 51-54), and Defendants concede that "applicants from China have a longer wait," (Defs. Br. at 13). Plaintiffs allege that counting derivatives against the annual immigrant visa caps causes the "backlog," and contend that "current estimates would require citizens of China who have already made a job-creating investment under the EB-5 Program to wait 16 years because of the backlogs that result from Defendants' Counting Policy." (Compl. ¶¶ 38, 53.) Plaintiffs claim that Defendants violate the APA by counting EB-5 derivatives toward the annual limits on visas (Counts I and II), and by failing to comply with notice-and-comment rulemaking for the "counting policy" (Count III).

On July 25, 2018, Plaintiffs filed this action and moved for a preliminary injunction to prohibit Defendants from counting derivatives against the limits on EB-5 visas and to make available the number of EB-5 visas that would be available if derivatives were not counted. (ECF Nos. 1 & 2.) The court issued a memorandum opinion on December 6, 2018, denying Plaintiffs' motion for preliminary injunction. (ECF No. 31 ("Dec. 6, 2018 Memorandum Opinion").)

## II. LEGAL STANDARD

Defendants have moved for dismissal under Federal Rule of Civil Procedure 12(b)(6), rather than for summary judgment under Rule 56. In an APA case, summary judgment is typically the mechanism for reviewing agency action; however, a court can entertain a Rule

4

12(b)(6) motion to dismiss if the complaint "presents no factual allegations, but rather only arguments about the legal conclusion[s] to be drawn about the agency action." *R.J. Reynolds Tobacco Co. v. U.S. Dep't of Agric.*, 130 F. Supp. 3d 356, 369 (D.D.C. 2015) (quoting *Marshall Cty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993)) (alteration in original). In such a case, there is "no real distinction . . . between the question presented" in the two motions because "the sufficiency of the complaint is the question on the merits." *Marshall Cty. Health Care Auth.*, 988 F.2d at 1226; *see also Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 271 F.3d 262, 266 (D.C. Cir. 2001) (holding that the agency did not need to produce the administrative record because the case could be resolved based on "nothing more than the statute and its legislative history"). Defendants assert—and Plaintiffs do not dispute—that "the central issue in this litigation is a pure question of law." (Defs. Br. at 15.) The court agrees, and therefore, Defendants' motion to dismiss is procedurally proper.

A motion to dismiss under Rule 12(b)(6) for failure to state a claim "tests the legal sufficiency of a complaint." *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible when the factual content allows the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Plaintiffs' factual allegations need not be "detailed," but "the Federal Rules demand more than 'an unadorned, the-defendant-unlawfully-harmed-me accusation.'" *McNair v. District of Columbia*, 213 F. Supp. 3d 81, 86 (D.D.C. 2016) (quoting *Iqbal*, 556 U.S. at 678). While a court generally does not consider matters beyond the pleadings for a motion to dismiss, it may consider "the facts alleged in the complaint, documents attached

5

as exhibits or incorporated by reference in the complaint, or documents upon which the plaintiff's complaint necessarily relies even if the document is produced not by the plaintiff in the complaint but by the defendant in a motion to dismiss[.]" *Ward v. D.C. Dep't of Youth Rehab. Servs.*, 768 F. Supp. 2d 117, 119–20 (D.D.C.2011) (internal quotation marks and citations omitted); *see also Equal Emp't Opportunity Comm'n v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).

## III. ANALYSIS

### A. Statutory Scheme

#### 1. Statutory Language and Context

In 1965 Congress passed the Immigration and Nationality Act Amendments of 1965, Pub. L. No. 89-236, 79 Stat. 911, 912 ("the 1965 Act"). The 1965 Act amended § 203 of the INA by establishing seven preference categories for the total number of available immigrant visas and a worldwide numerical quota on immigrant visas. The eighth category was a catch-all provision, and the ninth applied to spouses and children:

> Section 203(a): Aliens who are subject to the numerical limitations specified in section 201(a) shall be allotted visas . . . as follows: . . . (9) A spouse or child . . . shall, if not otherwise entitled to an immigrant status and the immediate issuance of a visa or to conditional entry under paragraphs (1) through (8), be entitled to the same status, and the same order of consideration provided in subsection (b), if accompanying, or following to join, his spouse or parent.
>
> Section 203(b): In considering applications for immigrant visas under subsection (a), consideration shall be given to applicants in the order in which the classes of which they are members are listed in subsection (a).

INA § 203(a)–(b) (1965).

The parties agree that the 1965 Act counted principals' spouses and children against the cap. (Compl. ¶¶ 43–44; Defs. Br. at 21.) The use of the phrase "entitled to the same status, and the same order of consideration" in subsection 203(a)(9) accorded immigrants' derivative

6

spouses and children the ability to immigrate at the same time and in the same category as their principals and to use the same visa number available to the principal investor. For the next twenty-five years, in accordance with the 1965 Act, State counted derivative spouses and children towards the cap.

In 1990, Congress passed the Immigration Act of 1990, which, among other things, reorganized the preference categories into three subsections: 1) family-based preferences in subsection 203(a), 2) employment-based preferences in subsection 203(b), and 3) a new category of "diversity" immigrants in subsection 203(c). *Id.* The 1990 Act added separate caps for family-based, employment-based, and diversity immigrants, but the three subsections continued to be subject to the overall cap in INA § 201. *Id.*

The 1990 Act also addressed the issue of principal immigrants' spouses and children:

> Treatment of family members. A spouse or child . . . shall, if not otherwise entitled to an immigrant status and the immediate issuance of a visa under subsection (a), (b), or (c), be entitled to the same status, and the same order of consideration provided in the respective subsection, if accompanying or following to join, the spouse or parent.

INA § 203(d), 8 U.S.C. § 1153(d). This subsection allows derivative spouses and children to obtain visas through their principal and entitles them to the same status and order of consideration accorded the principal. In contrast to subsections (a)–(c), subsection (d) does not state that derivatives count toward the worldwide annual limit in § 201.

Plaintiffs contend that because subsection 203(d) does not specifically state that the worldwide cap applies to derivative spouses and children, then no annual limit applies to them. This reading ignores the history of the provision and its plain language. Subsection 203(d) of the INA, as amended by the 1990 Act, is virtually identical to subsection 203(a)(9) as it existed after the 1965 Act. As this court previously explained, Congress did not adopt this virtually identical language in a vacuum. When it replicated this language in the 1990 Act, Congress was aware

7

that for twenty-five years State had interpreted subsection 203(a)(9) as amended by the 1965 Act to count derivatives against the caps. "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." *Lorillard v. Pons*, 434 U.S. 575, 580 (1978).

If Congress had intended to repudiate State's interpretation of the statute—with substantial immigration consequences—it would have done so clearly. *See Whitman v. American Trucking Ass'ns., Inc.*, 531 U.S. 457, 468 (2001) ("Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes."). By retaining the language pertaining to derivatives from the 1965 Act, Congress signaled that it was not making a monumental shift in immigration law governing derivatives. As the Supreme Court stated in *Lorillard*, "where, as here, Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute." 434 U.S. at 581.

Plaintiffs argue that the 1990 Act "fundamentally restructured the preference categories, and in so doing, brought spouses and children outside any capped preference category." (Pls. Br. at 22.) They also point to technical amendments to the 1990 Act that incorporate references to the cap in other provisions, but not for subsection 203(d). (*Id.* at 27–28.) They argue that the lack of amendment shows that Congress meant to exempt derivatives from the annual caps. (*Id.*) But these technical amendments just as plausibly show the opposite: that Congress saw no need to correct subsection 203(d) because it already contained limits based on the longstanding interpretation of the 1965 Act. Thus, while Plaintiffs are correct that the 1990 Act modified the INA's structure, they have failed to proffer any "evidence of any intent to repudiate the

8

longstanding administrative construction." *Haig v. Agee*, 453 U.S. 280, 297 (1981). In the absence of such evidence, the court concludes that when Congress amended the INA in 1990, using the same language as it used in 1965, it was adopting the "longstanding administrative construction," *id.* at 298, of the provision for derivatives.

    2. Statutory Conflicts

Plaintiffs also argue that reading § 203 to limit derivative visas conflicts with other parts of the INA and therefore violates the canon that a statute should be read as a "harmonious whole." (Pls. Br. at 18 (quoting *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1619 (2018)).) Plaintiffs arguments are unavailing.

    i. *"Same order of consideration"*

Plaintiffs contend that the caps prevent State from giving derivatives "the same order of consideration" as the investor principal because when a derivative follows to join an investor, the derivative receives a different visa number, putting them out of the "same order." (Pls. Br. at 18.) But State's procedures for assigning visa numbers for derivatives who follow to join was the same under the 1965 Act. Plaintiffs again offer no "evidence of any intent to repudiate the longstanding administrative construction." *Haig*, 453 U.S. at 297.

    ii. *Other references to EB-5 investors and their derivatives in the INA*

Plaintiffs argue the statute creates a "categorical difference" between investors and their derivatives, which shows that the numerical limit does not apply to derivatives. (Pls. Br. at 16–17.) They point to the Regional Center Program as an example of the distinction and contend that the provision allocates the 3,000 visas to investors, while "separately provid[ing] spouses and children an opportunity to join them." (Pls. Br. at 16.) The provision provides:

> For purposes of the [regional center] program . . . the Secretary of State, together with the Secretary of Homeland Security, shall set aside 3,000 visas

9

> annually . . . to include such aliens as are eligible for admission under section 203(b)(5) of the Immigration and Nationality Act and this section, *as well as* spouses or children which are eligible, under the terms of the Immigration and Nationality Act, to accompany or follow to join such aliens.

8 U.S.C. § 1153 note (2012) (Immigration Program) (emphasis added). Plaintiffs misread the provision, which by its plain terms counts both investors "as well as" derivative spouses or children toward the 3,000 visa set-aside. (Indeed, Plaintiffs contended as much in their motion for preliminary injunction (ECF No. 2 ("Pls. Mot. for Prelim. Inj.") at n.5).) Moreover, the provision contains no suggestion that derivatives do not count against the annual worldwide cap.

Plaintiffs further assert that counting derivatives toward the annual cap conflicts with the targeted employment area provision, which requires State to allot 3,000 EB-5 visas to immigrants investing in targeted employment areas. (Pls. Br. at 21 (citing INA § 203(b)(5)(B)(i), 8 U.S.C. § 1153(b)(5)(B)(i)).) They argue that counting derivatives creates an "absurd result" wherein targeted employment area investments swallow "nearly all 10,000 visas" even though only 3,000 are allotted to them. (Pls. Br. at 21–22.) But Plaintiffs misunderstand the provision, which sets a floor, not a cap, on the number of investments in targeted employment areas. Moreover, most EB-5 investments are made in targeted employment areas. (ECF No. 45 ("Defs. Reply") at 14 (citing EB-5 Immigrant Investor Program Modernization, 84 Fed. Reg. 35,750, 35,799 (July 24, 2019) (noting 96% of EB-5 investments are made in targeted employment areas)).) Indeed, every individual Plaintiff in this case is a targeted employment area investor or derivative of one. (Compl. ¶¶ 14–26.) Thus, there is no conflict between counting derivatives against the annual cap and the targeted employment area provision.

### iii. Specific Exemptions and Inclusions

Both Plaintiffs and Defendants point to sections in the INA where Congress specifically exempted derivatives from or included derivatives in numerical limits. (Defs. Br. at 37 (citing 8 U.S.C. §§ 1101 (note), 1153 (note), 1157 (note), 1184(g)(2), (g)(8)(i), (g)(11)(C), (o)(3), (p)(2)(B), 1229c(a)(2)(C)); Pls. Br. at 24 (citing INA § 207(c)(2)).) The various citations show that the INA is not consistently drafted with language specifically exempting derivatives from or including derivatives in the numerical limits. Therefore, the court finds that, as discussed above, the longstanding interpretation in place before the 1990 Act provides the best reading of the provision, consistent with congressional intent.

### iv. Country Caps

Plaintiffs argue that the country limits in subsection 202(a) are not actually limits, but rather a guarantee of proportionality among the countries. (Pls. Br. at 30.) This argument contradicts the very title of the provision, which sets "[n]umerical limitations on individual foreign states." INA § 202, 8 U.S.C. § 1152.

Plaintiffs also contend that the country limits do not apply to derivatives because 202(a)(2) applies to immigrants who receive "visas made available . . . under subsections (a) and (b)" of § 203. INA § 202(a)(2), 8 U.S.C. § 1152(a)(2). But § 202 also provides rules for how to charge derivatives to particular foreign countries. *See* INA § 202(b), 8 U.S.C. § 1152(b). As this court previously explained in its Dec. 6, 2018 Memorandum Opinion, the rule for chargeability in subsection 202(b) necessarily presumes that derivatives are counted toward the per country cap; otherwise, the question of chargeability would be irrelevant. *See* INA § 202(b), 8 U.S.C. § 1152(b).

3. <u>Legislative History</u>

As the court noted in its Dec. 6, 2018 Memorandum Opinion, the legislative history of the 1990 Act further supports the conclusion that Congress intended to continue State's twenty-five-year interpretation of the 1965 Act by counting derivatives towards the caps. Each chamber passed its own bill. The Senate's version of INA § 203 included a subsection 203(c), which repeated the language on derivatives in the 1965 Act and applied it to each of the preference categories. Immigration Act of 1989, S. 358, 101st Cong. § 203(c) (as passed by Senate, July 13, 1989), 135 Cong. Rec. S8639-04, 1989 WL 181548. The House bill, however, took a different approach. Importantly, it explicitly exempted derivatives from the cap for employment-based immigrants. Section 101 of the House bill provided:

> (b) ALIENS NOT SUBJECT TO NUMERICAL LIMITATIONS. The following aliens are not subject to the worldwide levels or numerical limitations of subsection (a): . . . (3) An alien who is provided immigrant status under section 203(d) as the spouse or child of an immigrant under section 203(b).

S. 358, 101st Cong. § 101 (as passed by House, Oct. 3, 1990), 136 Cong. Rec. H8712-05, 1990 WL 144626. Thus, the Senate version continued to count derivatives towards the cap while the House version explicitly excluded derivatives from the cap.

These conflicting approaches are also reflected in the different numerical cap proposals in the House and Senate bills. The Senate proposed 150,000 annual visas. Immigration Act of 1989, S. 358, 101st Cong. § 201(d) (as passed by Senate, July 13, 1989), 135 Cong. Rec. S8639-04, 1989 WL 181548. The House proposed 65,000 principals. If, as Defendants suggest, each principal brings one or two derivatives (Defs. Br. at 29–30) it appears that the two chambers were considering similar annual total numbers of employment-based immigrants; the difference was in whether or not to count derivatives.

The Conference Committee incorporated the Senate's approach and rejected the House's language specifically exempting employment-based principals' spouses and children from the cap. The Conference Committee also set the employment-based cap at 140,000—just 10,000 fewer than the 150,000 initially proposed by the Senate. The Conference Report explained that the House's proposed cap was based solely on principals and did not include derivative spouses and children. H. Rep. 101-955, 136 Cong. Rec. H13203-01, H13236, 1990 WL 290409 (1990) ("The comparable House number for employment-based immigrants was 187,500, based on 75,000 principals. The House amendment allocated 65,000 employment-based visas during FY1991-96 and 75,000 thereafter (not including numerically exempt derivative spouses and children) . . ."). These references to the House's methodology, based on principals but not derivatives, show that the Committee intended to adopt a methodology for counting based on principals and derivatives. Thus, the court concludes that Congress was aware of, grappled with, and ultimately rejected the House's proposal to exclude derivatives from the annual cap. Although Plaintiffs point the court to various statements made by members of Congress suggesting that derivatives were excluded from the annual cap, these isolated floor statements carry little weight compared to the decisive language in the Conference Committee Report.

Therefore, the court finds that under § 203 of the INA, derivative spouses and children count toward the annual worldwide limit on employment-based visas.[1] Accordingly, the court finds that Plaintiffs fail to state a claim for relief and will grant Defendants' motion to dismiss Counts I and II.

---

[1] Because the court agrees with Defendants that Congress unambiguously spoke to the question at issue, the court need not reach the parties' arguments about deference.

B. **Notice and Comment**

Subpart D, titled "Immigrants Subject to Numerical Limitations," governs State's allotment of visas under the worldwide limit. 22 C.F.R. Ch. I, Subch. E, Pt. 42, Subpart D. Section 42.32 provides that "[a]liens subject to the worldwide level specified in section 201(d) for employment-based immigrants in a fiscal year shall be allotted visas as indicated below." 22 C.F.R. § 42.32. Subsection (e)(2) provides:

> Entitlement to derivative status. Pursuant to INA 203(d), and whether or not named in the petition, the spouse or child of an employment-based fifth preference immigrant, if not otherwise entitled to an immigrant status and the immediate issuance of a visa, is entitled to a derivative status corresponding to the classification and priority date of the beneficiary of the petition.

22 C.F.R. § 42.32(e)(2). Plaintiffs contend that because subsection (e)(2) makes no "reference" to the numerical limit, it does not govern State's policy of counting derivatives against the worldwide cap. (Pls. Br. at 36.) This reading ignores the rest of the language in the regulation specifically stating that the visas are "allotted" for "aliens subject to worldwide limits" according to the rules in the regulation's following subsections.[2]

Further, enactment of § 42.32 complied with APA notice-and-comment requirements. The APA "requires agencies to afford notice of a proposed rulemaking and an opportunity for public comment prior to a rule's promulgation, amendment, modification, or repeal." *Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1044 (D.C. Cir. 1987). State published an interim rule that listed EB-5 derivatives within Subpart D, titled "Immigrants Subject to Numerical Limitation." Interim Rule, *Visas: Documentation of Immigrants Under the Immigration and Nationality Act,*

---

[2] The above regulation also dispels Plaintiffs' contention that the "counting policy" is only reflected in State's Foreign Affairs Manual. (Pls. Br. at 12.)

*as Amended; Immigrants Not Subject to Numerical Limitations of INA 201 and 202; Immigrants Subject to Numerical Limitation*, 56 Fed. Reg. 49,675, 49,678 (Oct. 1, 1991). This interim rule, 56 Fed. Reg. 49,675, issued on October 1, 1991, provided a 30-day public comment period. *Id.* ("Written comments must be received on or before October 31, 1991.") State finalized its rule in 1993 and noted that "Interim Rule 1491, published in the Federal Register at 56 FR 49675, October 1, 1991, invited interested persons to submit comments concerning the amendments therein. No comments were received." Final Rule, *Visas: Documentation of Immigrants Under the Immigration and Nationality Act, as Amended; Numerical Limitations*, 58 Fed. Reg. 48,446, 48,447 (Sept. 16, 1993). The "Interim Rule's regulations" from 1991 were "adopted without changes," *id.*, in September 1993. Therefore, the court finds the agency complied with the APA's notice-and-comment rulemaking requirements.

Accordingly, the court will grant Defendants' motion to dismiss Count III.

## IV. CONCLUSION

For the stated reasons, the court will GRANT Defendants' motion to dismiss. A corresponding Order will issue separately.

Date: March 25, 2020

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge